In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

**NO. 09-16-00166-CR**
_____

**BRIAN CHRISTOPHER KEITH**

**V.**

**THE STATE OF TEXAS**

**On Appeal from the 75th District Court**
**Liberty County, Texas**
**Trial Cause No. CR30815**

**MEMORANDUM OPINION**

A jury convicted appellant, Brian Christopher Keith, of capital murder of a child under the age of ten years, and the trial court sentenced him to life without parole. *See* Tex. Penal Code Ann. § 19.03(a)(8) (West Supp. 2016). Keith challenges the sufficiency of the evidence supporting the conviction, and he further complains that he was egregiously harmed by the trial court's failure to limit the applicable conduct elements in the definitions of "intentionally" and "knowingly" in the jury charge and that the trial court committed reversible error by denying the jury's

1

requests to review certain evidence during its deliberations in the guilt/innocence phase of the trial. We affirm.

## I. Background

The complainant N.K., born on May 31, 2013, was the infant daughter of S.K.[1] While Keith was listed on N.K.'s birth certificate as the father, it was uncontroverted that he was not the biological father of the child. During an extended period of absence from the home by Keith, S.K. had an affair with another man, which produced the child. There was testimony at trial that Keith had expressed his contempt for the mother's infidelity and that he suggested she should give the baby up for adoption since he was not the father. After the child was born, Keith had little interaction with the infant.

Keith shared the master bedroom of a single-wide mobile home with S.K., her two sons, and the infant daughter, N.K. Also living in the home was N.K.'s maternal grandmother, who was disabled and slept in a recliner in the den, and a friend of S.K., Kali Baucum, who slept in the opposite end of the mobile home.

---

[1] To protect the privacy of the victim and her mother, we identify them by using only their initials. *See* Tex. Const. art. 1 § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

2

On the evening of July 1, 2013, N.K. was reportedly put to bed just before midnight. On July 2, 2013, when the infant was only 33 days old, Keith awoke at 4:00 a.m. to get ready to go to work and stated the baby was crying. Based on testimony at trial and the autopsy report, it was at this time that Keith may have reached into the crib and "patted" the baby on the head, or he may have hit the baby, or he may have rocked the baby back to sleep and placed her back in her crib. The "or" is intentionally used in the preceding sentence as neither parent who had care, custody, or control of the infant on the night of this incident testified, nor were any written or recorded statements of the parents introduced into evidence in the trial of this cause.[2] The record contains only statements of others, who either spoke with or interviewed the parents after the incident concerning the events of the evening before or the early morning hours when this incident occurred, or other hearsay statements included in the record which were admitted into evidence without objection.

---

[2] We reference this fact only to emphasize that the record is wholly devoid of any direct evidence from either parent as to the events leading to N.K.'s death. It is well settled that the State may not comment on the accused's failure to testify. *Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011). Such a comment offends both state and federal constitutions as well as Texas statutory law. *See* U.S. Const. amend V; Tex. Const. art. I, § 10; Tex. Code Crim. Proc. Ann. art. 38.08 (West 2005); *Griffin v. Cal.*, 380 U.S. 609, 615 (1965) ("[T]he Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."). We do not consider Keith's decision not to testify in the trial during our review of this appeal.

Keith made a phone call to his supervisor, Joe Harrison, at 5:23 a.m. and left for work. Keith parked his truck in the yard at his place of employment, Pioneer Energy Services, and boarded a company truck that took him and his co-workers to an oilfield rig for the day. The rig operator for Pioneer Energy Services, Gordon Andrews, testified that when the company truck picked him up on the morning of July 2nd at 5:45 a.m., Keith was in the truck. According to GPS records, the truck proceeded to Mont Belvieu and arrived at the oilfield rig at 7:20 a.m.

At 5:52 a.m., Keith called Kali and told her that he thought he left his truck's headlights on and instructed her to wake up his wife and get the spare set of keys from her. At 5:55 a.m., Keith called Rhonda Ainsworth, S.K.'s aunt and the only one with a car, and asked her to pick up the spare set of keys from his house and to go to the yard and turn off his headlights. At 5:56 a.m., Keith called Kali to ensure she had done as he requested. He called Kali again at 6:17 a.m. and spoke with her for just over one minute. Keith neither made nor received any calls on his phone for the next five hours.

Kali testified that after she got the first phone call from Keith, she walked to the far end of the mobile home and awoke S.K. and relayed his message. Without checking on or seeing the infant, Kali returned to her room and went back to bed.

4

Rhonda Ainsworth testified that she received a phone call from Keith around 6:00 a.m. and told him that she would go get the keys once she was awake. Somewhere around 9:45 a.m., Rhonda went to Keith's home. She testified that when she entered the master bedroom of the mobile home, S.K. was asleep in the bed with one of her sons, the other son was in a twin bed in the room, and the infant appeared to be asleep in her crib. She noted that the infant was on her stomach. Rhonda awakened S.K., who got the keys off of the nightstand, handed them to Rhonda, then turned over and went back to sleep. Rhonda left the home with the keys but forgot about her task and instead, went to the VFW hall to have coffee with a friend.

The maternal grandmother living in the home was receiving care from a home healthcare nurse. At trial, the nurse testified that she called the grandmother between 9:00 a.m. and 9:30 a.m. on the morning of July 2nd to let her know what time she would be at her home for treatment. The nurse testified that Keith answered the grandmother's phone when she called and that she recognized his voice.[3]

The nurse arrived at the home between 10:45 a.m. and 11:00 a.m. When she arrived, only the grandmother was awake in the household. She completed the

---

[3] Because it was conclusively established by GPS records and testimony of other witnesses that Keith could not have answered the maternal grandmother's phone when the nurse called, the jury could not reasonably have relied upon this testimony in reaching a guilty verdict.

5

grandmother's treatment and was outside in her car preparing to leave for her next appointment when Kali came running out of the front door screaming that the baby was dead and she needed help. The nurse ran into the home and saw S.K., hysterical and holding the baby in her arms. The infant's arms and face were blue and her lips were purple. The nurse called 911 from her cell phone and through the aid of a first responder over the phone, the nurse began attempts at CPR. When other first responders arrived, the infant was moved to an ambulance, where life-saving efforts at CPR were continued. The infant was transported to a hospital, where she was eventually pronounced dead.

The home healthcare nurse testified that she did not see where the baby was in the bedroom when the baby was discovered not breathing, and S.K. never told her where she found the baby. The nurse also testified that she did not see Keith at the house at any time after she arrived to treat the maternal grandmother.

Kali called Keith at 11:16 a.m. and left a message on his voicemail telling him that there was an emergency and to either call or come home. Six minutes later, at 11:22 a.m., Keith returned Kali's call. Keith received permission from Andrews, the rig operator for Pioneer Energy, to leave, and Andrews instructed Robert Taylor to drive Keith back to the yard. Robert Taylor testified they left the rig somewhere

around 11:30 a.m. to drive back to the yard, and it took approximately one hour to travel the distance.

The receptionist and office manager for Pioneer Energy Services each testified that they arrived for work around 8:00 a.m. on the morning of this incident. Both testified that the topic of conversation within the office on that morning was the passing of Keith's infant child. Specifically, the office manager recalled the conversation was that someone was bringing Keith to the yard or had already brought him to the yard, and the receptionist recalled that they were looking for someone to go work in Keith's place because his baby had passed away. Andrews, to whom Keith reported his emergency and requested to leave the oil rig, testified that there was no prior conversation on the oil rig about something being wrong with Keith's child before Keith reported the emergency. On cross-examination, the receptionist agreed with the defense that if Keith had told someone in the office before he left on the morning of the incident that his baby had died, Pioneer would not have sent him to the oil rig that morning only to have to find a replacement for him.

Kali, who was staying with the Keith family to help S.K., testified that Keith called her multiple times on his way home from the rig. When Keith arrived home, it was Kali's opinion that Keith was upset. However, Sgt. Cummins with the Liberty County Sheriff's Department testified that he was at the home when Keith arrived

7

and Keith was very calm, showed no signs of emotional distress, and began moving car seats from one car to another before he went inside to console his wife. When Sgt. Cummins observed the parents at the hospital, he testified that S.K. was very upset and emotional upon arriving at the hospital, while Keith was calm and showed no signs of emotional distress or being upset. Another deputy who also observed Keith at the hospital testified, "It was unsettling. . . . [I]t appeared that he was smiling and laughing and was energetic." A nurse at the hospital testified that S.K. was hysterical and had to be medicated at the hospital. The nurse happened to walk into a room where Keith and S.K. were alone after the baby had been pronounced dead, and she observed an angry Keith yelling at S.K., "Shut the f--- up. You f---ing did this. You shut the f--- up[.]"

The investigator assigned to the case in December 2013, testified that when he called S.K. and requested that she come in for an interview, Keith became angry, was cursing and insisted that S.K. only be interviewed while in his presence. After S.K. was interviewed, Keith voluntarily met with the detectives and answered their questions. Keith reportedly told the detectives that he got up at 4:00 a.m. on the morning the baby died, and the baby was crying. He told the officers that he patted the baby on the head. One officer testified that Keith said he may have hit the baby; however, the other officer present never mentioned that Keith made such a

8

statement. Keith represented to the officers that the baby was alive when he left for work that morning.

Dr. John Ralston, the chief forensic pathologist for Forensic Medical of Texas, based in Beaumont, performed the autopsy on N.K. and testified on behalf of the State regarding his findings. He testified that he has performed well over 2000 autopsies in his career. The purpose of an autopsy is to determine the cause and the manner of death. Upon physical examination, Ralston noted a bruise on the infant's lower back and marked discoloration of the abdomen, which he noted as unusual. He also noted that the fingernail beds were cyanotic, or blue in color, indicating a lack of oxygen.

Ralston attributed the abdominal discoloration to loose blood in the child's abdomen. Upon further examination, it was his opinion that the blood came from a lacerated liver. He measured the amount of blood in the abdomen at around 30cc's or 8 percent of the child's total blood volume. The discoloration of the abdomen was caused by early onset of bacterial development from the free blood in the abdomen and it was evident across the entirety of the abdomen from the diaphragm to the pelvis. Dr. Ralston noted that this discoloration was different from the normal "greening of the abdomen" seen in all corpses. From the staining of the skin, Dr. Ralston opined that the child was lying face down, on her stomach, for at least a few

9

hours after her death. He also noted blanching around the belly button, another indication that the child was lying on her stomach after death. Further, Ralston identified a photograph of the shoulder to the top of the head and noted discoloration of the head, which he opined also indicated the child was face down after she died.

Dr. Ralston testified that a lacerated liver bleeds quite profusely and will continue to bleed as long as the heart is beating, usually requiring surgical intervention to stop the blood flow. While he could not say exactly how long the liver bled, Dr. Ralston estimated that it bled for a minute or two based on the amount of free blood recovered from the abdomen.

The bruise to the lower back was located centrally over the spinal column. When Dr. Ralston entered the spinal column, he found actual tearing and hemorrhaging on both sides of the spinal column from the spine being hyperextended or being bent way too far back. Further examination revealed petechial hemorrhages in the kidneys, the lungs, the heart, the thymus, and the spinal column, where small blood vessels had hemorrhaged in these organs. He attributed these injuries to compressional force being applied to the child's back.

The defense's position was that all of these injuries to the child were caused by efforts to save the child through CPR. While Dr. Ralston agreed that there was a possibility that such injuries could have been caused by vigorous adult CPR

methods, he indicated that it is unusual to find such injuries from infant CPR, which is performed with two fingers to the chest instead of using the base of the palm as in adult CPR. Further, based on reports from EMT personnel on the scene and hospital emergency room records, Dr. Ralston determined that the child had been deceased for at least a couple of hours before any resuscitative efforts were begun. The petechial hemorrhages and the bleeding from the lacerated liver would only have occurred if the heart was beating at the time of the injuries, as the circulatory system collapses after death. While the official time of death was recorded by the hospital as 12:10 p.m., Dr. Ralston indicated that the child had been deceased for a number of hours before that time. An ER nurse recorded the infant's body temperature upon arriving at the hospital at 94.1 degrees Fahrenheit. Dr. Ralston discounted the accuracy of using the temperature of the body as a means to determine the exact time of death. While the human body temperature usually drops about 1 degree Celsius or 1.5 degrees Fahrenheit each hour after death, it was his opinion that there are too many variables involved to determine a realistic time of death using that method. However, he agreed that the child's body temperature indicated that she had been deceased for at least a few hours before 12:10 p.m.

Dr. Ralston testified that in his opinion, the cause of death was asphyxiation due to compressional force being applied to the child's back, while she was lying on

11

her stomach, preventing the chest from expanding and the child from breathing for a sufficient amount of time to cause her death. He recorded the final manner of death as homicide. He rejected the defense theory that the infant died from asphyxiation due to an unsafe sleep environment, noting that suffocation would not explain the compressional injuries he found to the child's internal organs. But for the evidence of the compressional injuries to the internal organs, suffocation from an unsafe sleep environment would have been high on Ralston's index of suspicion. He also testified that he had found no petechial hemorrhages in the infant's eyes, and noted that if a child is face down in soft bedding and can't get her head up or the child is co-sleeping with another person and somebody rolls over on the child, hemorrhages in the eyes are commonly found.

A grand jury indicted Keith for capital murder, specifically alleging that Keith caused the death of N.K., a child under the age of ten years, by compressional injuries. *See* Tex. Penal Code Ann. § 19.03(a)(8). The State elected not to pursue the death penalty. After a trial, a jury found Keith guilty of capital murder by unanimous verdict, and the trial court sentenced him to life in prison without the possibility of parole. The trial court certified Keith's right to appeal, and this appeal timely followed.

12

## II. Sufficiency of the Evidence

To obtain a conviction for capital murder in this case, the State was required to prove that Keith intentionally or knowingly caused the death of N.K., a child under the age of ten years. *See* Tex. Penal Code Ann. §§ 19.02(b)(1) (West 2011), 19.03(a)(8).

In his first issue on appeal, Keith contends that the evidence is insufficient to support the jury's guilty verdict. He argues that the only evidence at trial shows that the child died from asphyxia, more likely than not because of an unsafe sleeping environment, and that any injuries to the child identified by the autopsy were inflicted by aggressive and prolonged CPR efforts to resuscitate the child.

### A. Standard of Review

To properly assess the sufficiency of evidence supporting a jury's verdict of guilt, a reviewing court must "consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). In doing so, we defer to the jury's factual findings and resolve all reasonable inferences in favor of their verdict, as the jury is the sole judge of the credibility of witnesses and the

weight to be afforded to the testimony of each. *Brooks v. State*, 323 S.W.3d 893, 902 (Tex. Crim. App. 2010); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). The jury may choose to believe or disbelieve any witness or any portion of a witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). This Court's role on appeal "is restricted to guarding against the rare occurrence when a factfinder does not act rationally[,]" and we must "defer to the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010) (internal citations omitted). Thus, when performing an evidentiary sufficiency review, "[t]his Court may not re-evaluate the weight and credibility of the record evidence and thereby substitute our judgment for that of the fact-finder." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (quoting *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999)). The key question is whether "the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Id*.

In his brief on appeal, Keith argues that the State did not offer any evidence to exclude the possibility that something else significant didn't occur with regard to the baby after Keith left the house for work, such as the mother putting the baby in bed with her after Keith left for work, then falling asleep and rolling over on N.K.,

14

given the testimony that S.K. had previously co-slept with the infant, or that one of the other children, who were 3 and 5 years of age, possibly climbing into the crib to try to get their sister to stop crying and placing some or all of their weight on the baby. However, in *Geesa v. State*, the Court of Criminal Appeals rejected the "reasonable hypothesis analytical construct" as a method of appellate review for evidentiary sufficiency in criminal cases. 820 S.W.2d 154, 156–61 (Tex. Crim. App. 1991), *overruled on other grounds*, 28 S.W.3d 570 (Tex. Crim. App. 2000). The reasonable hypothesis analytical construct required that "[a] conviction based on circumstantial evidence must exclude every other reasonable hypothesis except the guilt of the accused." *Carlsen v. State*, 654 S.W.2d 444, 447 (Tex. Crim. App. 1983), *overruled by Geesa*, 820 S.W.2d at 161. In rejecting the "reasonable hypothesis" construct for appellate review, the Court noted that such a review in circumstantial evidence cases "effectively repudiates the jury's prerogative to weigh the evidence, to judge the credibility of the witnesses, and to choose between conflicting theories of the case." *Geesa*, 820 S.W.2d at 159. Thus, it is now well settled that "[d]irect evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Ramsey v. State,* 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *see also Carrizales*

*v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (holding that "[i]t is not necessary that the evidence directly proves the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing the guilt of the actor").

Viewing all of the evidence under these established standards, we find that the combined, cumulative force of the various incremental pieces of circumstantial evidence is sufficient to support the verdict. *See Clayton v. State*, 235 S.W.3d 772, 778–79 (Tex. Crim. App. 2007).

## B. Evidence supporting conviction

The evidence showed that the baby was reportedly put in her crib around midnight. Keith was awake at 4:00 a.m. on the morning of the baby's death, and he admitted to others that the baby was awake and crying before he left for work. Keith reportedly told the investigators that he reached into the crib and patted the baby on her head and that he may have hit her. The autopsy report stated that Keith "rocked the baby back to sleep at approximately 5:00 a.m." There is no direct evidence in the record as to the position the child was placed in the crib, but the home healthcare nurse did testify that, on at least one previous visit, she had seen the child asleep on its back in S.K.'s bed with pillows placed around the child. At around 9:45 a.m., the infant was observed on her stomach in the crib by Rhonda Ainsworth. The record reflects that the infant was found lying on her stomach or face down in the crib at

around 11:15 a.m. The jury could have reasonably concluded that Keith was the only person who handled the child on the morning before her death and further, that he placed the child in the crib face down.

Keith was shown to have had a motive to harm the child. He was upset and embarrassed that his wife had had an affair with another man which produced the child. Several witnesses testified that he did not want S.K. to keep the baby, referred to the baby as "it" at times, and had very little to no interaction with the child after her birth.

Testimony in the trial showed Keith lacked sympathy or compassion for the child or her mother. Once Keith arrived home after receiving word that the child was found unresponsive, various witnesses testified that his emotional reaction to the tragic situation was unusual and out of line for a parent. A police officer testified Keith was very calm, with no signs of emotional distress or excited agitation and that he went about transferring children's car seats from one vehicle to another before going in to console his wife. Another officer described Keith's demeanor as "unsettling" and reported that he was laughing and energetic at the hospital, while the mother was hysterical. A nurse testified that she overheard Keith cursing at S.K. at the hospital and showing no sympathy to the mother of the deceased child. In contrast, the jury heard testimony that S.K. was emotionally distraught to the point

17

of requiring medication, and Kali testified that she was awakened to a horrible scream when S.K. discovered N.K. was not breathing.

When the baby was found, her arms and face were blue and lips were purple. A medic on the scene described the baby's skin coloring as cyanotic, a grayish ash color the skin turns when not properly perfused with oxygen. The first responders found no signs of life in the baby. Likewise, the E.R. doctor testified that when the baby arrived at the hospital, she had no spontaneous heart beat and no signs of being alive. It was his opinion that the child was already dead when she arrived at the E.R. While Dr. Ralston could not give a precise time of death, he stated that from the staining of her skin on her abdomen, face and head, he opined that the baby had been face down on her stomach for a period of at least a few hours after she died. And, while Dr. Ralston dismissed using body temperature as an accurate method for determining time of death, he estimated that with a body temperature of 94.1 at the hospital, the baby had been dead for a few hours.

Dr. Ralston found petechial hemorrhages on the child's lungs, heart, thymus, kidneys and around the spinal column and a laceration of the liver. He attributed the hemorrhages and laceration of the liver to compressional forces. Ralston testified that a lacerated liver will bleed profusely and continue to bleed, without surgical intervention, until the heart stops beating. He estimated from the amount of blood

18

he found in the abdominal cavity that the liver continued to bleed for one to two minutes after it was injured. If the heart had continued to beat, there would have been more blood in the abdominal cavity. While the defense attempted to show that these same injuries could occur from aggressive CPR, Ralston indicated that someone would have to use "way too much force" in performing CPR on a living person to cause such injuries, and there is no such evidence in the record. Because these are injuries with vital reaction, i.e. hemorrhaging of the blood vessels and bleeding, it was his opinion that the injuries he identified were sustained at the time of death or before the time of death. He explained that once the heart stops beating, the circulatory system collapses. Because, in his opinion, CPR was not performed on the child until long after her death, CPR could not have caused the injuries he identified during the autopsy or caused the liver to bleed out the amount of blood found in the abdominal cavity. It was his further opinion that even aggressive CPR would not account for the tearing and hemorrhaging of the spinal column or the subcutaneous bruise to the child's back. In his opinion, Dr. Ralston concluded that someone applied compressional force to the child's back for a period of at least two minutes while the child was face down in the crib, preventing her from expanding her chest and breathing, with sufficient force to rupture the small capillaries of the internal organs and lacerating the liver, and maintained such compression until the

19

child died. Further, Dr. Ralston identified an autopsy photograph and explained to the jury that the loose blood in the child's abdomen had stained the abdominal wall from the child's body having lain on her stomach for some time after she died.

The defense pathology expert disagreed with Dr. Ralston's conclusions and findings. Dr. Stephen Pustilnik, a forensic pathologist with his own private practice and part-time pathologist for the Lubbock County Medical Examiner's office, maintained that the injuries identified by Dr. Ralston were all inflicted post-mortem by the resuscitative efforts of CPR. Dr. Pustilnik agreed, though, that the child died from asphyxiation and had been deceased at least a couple of hours prior to being found around 11:15 a.m. He attributed the death to an unsafe sleeping situation and would have labeled the incident an accident.

However, all of the witnesses testified that to properly perform CPR on an infant, the infant must be lying on their back. A jury could have reasonably concluded that the evidence of staining on the child's abdomen was inconsistent with Dr. Pustilnik's theory that the internal bleeding was caused postmortem by efforts to resuscitate the child as the child would have always been on her back during such procedures. If indeed the loose blood in the abdomen came from a lacerated liver during CPR, there would not have been the amount of staining on the abdominal wall. The only person shown to have had physical interaction with the infant on the

20

morning of her death was Keith. Thus, the jury could have reasonably concluded that Keith intentionally placed the child in the crib on her stomach and applied compressional force downward to her back, with such force to prohibit the child from expanding her chest to breathe and intentionally causing her death by suffocation before he left for work that morning.

The jury in this case had the opportunity to hear and see the witnesses, including the officers and medical experts, as well as all the other evidence described herein. According due deference to the jury's exclusive right to determine the credibility of the witnesses and the weight to attach to the evidence and viewing all of the admitted evidence in the light most favorable to the verdict, we find that there is sufficient evidence by which the jury could have found beyond a reasonable doubt that Keith was guilty of capital murder as charged. We therefore overrule Keith's first appellate issue.

In his second issue on appeal, Keith submits that it is not fair or equal for defendants who assert an affirmative defense to have both a legal sufficiency review and a factual sufficiency review of the evidence as was determined in *Matlock v. State*, 392 S.W.3d 662, 669 (Tex. Crim. App. 2013), while defendants who do not assert an affirmative defense only receive a legal sufficiency review as was determined in *Brooks v. State*, 323 S.W.3d at 895. As an intermediate court, we are

21

required to follow binding precedent in cases decided by the Court of Criminal Appeals. *See State v. DeLay*, 208 S.W.3d 603, 607 (Tex. App.—Austin 2006) ("As an intermediate appellate court, we lack the authority to overrule an opinion of the court of criminal appeals."), *aff'd sub nom. State v. Colyandro*, 233 S.W.3d 870 (Tex. Crim. App. 2007); *Gonzales v. State*, 190 S.W.3d 125, 130 n.1 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) ("[A]s an intermediate appellate court, we must follow the binding precedent of the Court of Criminal Appeals."); *State v. Stevenson*, 993 S.W.2d 857, 867 (Tex. App.—Fort Worth 1999, no pet.) ("Because a decision of the court of criminal appeals is binding precedent, we are compelled to comply with its dictates."); *see also* Tex. Const. art. V, § 5(a) (providing that in Texas, the Texas Court of Criminal Appeals is the final authority regarding matters of criminal law).

Because the Texas Court of Criminal Appeals has held that when determining whether the evidence is sufficient to support a criminal conviction, the only standard an appellate court should apply is the *Jackson v. Virginia* test for legal sufficiency, we are at liberty to apply no other standard. *Brooks*, 323 S.W.3d at 895. Therefore, we overrule Keith's second issue on appeal.

22

### III. Jury Charge Error

Keith asserts in his third and fourth issues on appeal that the trial court committed reversible error, and caused Keith egregious harm, by including the nature of conduct portion of the definitions of "intentionally" and "knowingly" in the jury charge at the guilt/innocence phase of the trial. We analyze this issue under the standard of *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). Under *Almanza*, when an appellant does not preserve jury charge error by a timely objection, the unobjected-to charge requires reversal only if it resulted in egregious harm, i.e. the "error is so egregious and created such harm that [the accused] has not had a fair and impartial trial[.]" *Id*. Keith concedes in his appellate brief that no objections were lodged in the trial court to the definitions in question. To determine the degree of harm, a reviewing court should consider "the entire jury charge, the state of the evidence, . . . the argument of counsel[,] and any other relevant information revealed by the record of the trial as a whole." *Id*.; *see also Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008).

In this case, it is not enough for the State to prove that Keith engaged in conduct with the requisite criminal intent; the State must also prove that Keith caused the result intentionally or knowingly. *See Delgado v. State*, 944 S.W.2d 497, 498 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd).

23

The instructions in this case read as follows:

> A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

These instructions, while correctly stating the law applicable to a crime pertaining to conduct, were inappropriate to the charge against Keith, a crime which is result-oriented. It is clear that the definitions in the charge erroneously included references to conduct and not to the result of that conduct. *See id.*; *Green v. State*, 891 S.W.2d 289, 294 (Tex. App.—Houston [1st Dist.] 1994, pet ref'd). If the instructions were taken alone, the jury could convict based on Keith's intent to engage in conduct without taking into account the motivation or intent to kill. This was error.

However, a mistake or error in a jury charge does not automatically create reversible error. *Green*, 891 S.W.2d at 294. Neither does the failure to preserve error in a jury charge bar appellate review. *Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008). Rather, it establishes the degree of harm that is necessary for

24

reversal. *Id.* Because Keith failed to object to the charge at trial, the error will not result in reversal unless it is "so egregious and created such harm that appellant was denied a fair trial." *Id.* (quoting *Warner v. State*, No. 03-04-00203-CR, 2005 WL 2313591, at *5 (Tex. App.—Austin Sept. 22, 2005, pet. granted) (mem.op.)). "Errors that result in egregious harm are those that affect 'the very basis of the case,' 'deprive the defendant of a valuable right,' or 'vitally affect a defensive theory.'" *Id.* at 461–62 (quoting *Warner*, 2005 WL 2313591, at *5). In determining whether egregious error exists, every charge error must be assessed in light of "the entire jury charge, the state of the evidence, including the contested issues and weight of the probative evidence, the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole." *Id.* at 461 (quoting *Warner*, 2005 WL 2313591, at *5). Egregious harm is a difficult standard to meet. *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011). The record must show "actual, not just theoretical, harm to the accused[,]" and we must be able to conclude that Keith has been "deprived of a fair and impartial trial." *Id.* at 489–90. "In assessing harm resulting from the inclusion of improper conduct elements in the definitions of culpable mental states, we 'may consider the degree, if any, to which the culpable mental states were limited by the application portions of the jury charge.'" *Hughes v. State*, 897 S.W.2d 285, 297 (Tex. Crim. App. 1994) (quoting *Cook v. State*, 884 S.W.2d

25

485, 492 fn.6 (Tex. Crim. App. 1994). Here, the application portion of the jury charge read as follows:

> You must decide whether the state has proved, beyond a reasonable doubt, four elements. The elements are that:
> 1. The defendant, BRIAN CHRISTOPHER KEITH, intentionally or knowingly caused the death of [N.K.] by compressional injuries;
> 2. In Liberty County, Texas,
> 3. On or about the 2nd day of July, 2013; and
> 4. Said [N.K.] was an individual younger than 10 years of age.
>
> If you all agree the state has failed to prove, beyond a reasonable doubt, one or more of the elements 1, 2, 3, and 4 listed above[,] you must find the defendant "not guilty."
>
> If you all agree the state has proved each of the four elements listed above, you must find the defendant "guilty."

The application paragraph of the charge correctly instructed the jury that they must believe beyond a reasonable doubt that Keith "*intentionally* or *knowingly* caused the death" before they could find him guilty. (Emphasis added.) "Where the application paragraph correctly instructs the jury, an error in the abstract instruction is not egregious." *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999). Accordingly, we determine the error did not result in egregious harm. Keith's third and fourth issues are overruled.

## IV. Jury Deliberation Error

Keith also complains the trial court committed reversible error by denying the jury's request to review evidence during its deliberations. In issues five and six

respectively, Keith complains that the trial court refused to provide the jury with Keith's phone records and the GPS records from Pioneer Energy's company truck.

During deliberations, the jury foreman sent out a note requesting the phone records of Keith's phone, the Pioneer Energy truck's GPS records, and the transcript of the testimony of Dr. Pustilnik. While Keith concedes there was no error by not providing the transcript of Dr. Pustilnik's testimony, Keith maintains his complaint that the trial court's response is silent as to whether or not it complied with the jury's request for written evidence admitted during the trial. There is nothing in the record as to whether the trial court did or did not comply with such request. Nothing in the record shows any objection by counsel for the defense that such exhibits were not provided to the jury. Article 36.25 of the Texas Code of Criminal Procedure provides that the trial court shall furnish the jury upon its request any exhibits admitted as evidence in the case. Tex. Code Crim. Proc. Ann. art. 36.25 (West 2006). In light of the clear instructions of article 36.25, without clear evidence in the record that the trial court failed to comply with the law and without any objection in the record, we presume the trial court fully complied with the jury's request. *See Tucker v. State*, 990 S.W.2d 261, 262 (Tex. Crim. App. 1999) (stating that to present a complaint for appellate review, appellant must show the complaint was made to the trial judge by timely request, objection, or motion sufficiently specific to make the judge aware of

grounds of complaint and the judge ruled adversely or refused to rule). We overrule issues five and six.

Having overruled all issues of appellant, we affirm the judgment of the trial court.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on October 10, 2017
Opinion Delivered December 6, 2017
Do Not Publish

Before McKeithen, C.J., Kreger and Horton, JJ.

28